**AMSTAR CORPORATION, Plaintiff,**

v.

**M/V ALEXANDROS T., her engines, etc.
and Nava Shipping Co., Ltd.,
Defendants.**

**Civ. No. H–76–166.**

United States District Court,
D. Maryland.

May 2, 1977.

Donald A. Krach and Niles, Barton & Wilmer, Baltimore, Md., for plaintiff.

Kieron F. Quinn and Ober, Grimes & Shriver, Baltimore, Md., for defendants.

## MEMORANDUM AND ORDER

ALEXANDER HARVEY, II, District Judge.

This civil action, filed pursuant to Rule 9(h), F.R.Civ.P., involves a claim for relief within the admiralty and maritime jurisdiction of this Court. The plaintiff, Amstar Corporation, brought this action *in rem* against the M/V ALEXANDROS T. and *in personam* against the ship's owner. Plaintiff seeks to recover damages for losses sustained when a cargo of raw sugar owned by plaintiff was delivered by the defendants in damaged condition at plaintiff's refinery in Baltimore on January 31, 1976.

Presently before the Court is the defendants' motion to dismiss the complaint. Defendants assert various grounds in support of their motion, but rely mainly on the contention that the procedures established by Rules A through F of the Supplemental Rules for Certain Admiralty and Maritime Claims, F.R.Civ.P., pursuant to which the ALEXANDROS T. was arrested and attached, are insufficient under the due process clause of the Fifth Amendment. In view of various arguments advanced by the plaintiff in opposing the pending motion, this Court determined that an understanding of the facts surrounding the bringing of this action was necessary for a proper consideration of the constitutional issue presented. Following briefing and a hearing on the motion, the Court met with counsel on several occasions, and a stipulation was prepared and filed.[1] It has been agreed that the stipulation is solely for the purpose of a ruling on the pending motion to dismiss, and the finding of facts made herein and based on the stipulation will not be conclusive if and when this case comes on for trial.

---

1. Plaintiff claims that there are many additional facts relevant to the issues presently before the Court. These additional facts, most of which were disputed by the defendants, were ruled by the Court to be irrelevant to the questions presented by defendants' motion to dismiss. The record contains a proffer of these additional facts, and plaintiff's objection to the Court's ruling has been preserved.

330

## I

*Facts*

The M/V ALEXANDROS T. is a motor vessel registered in Cyprus and owned by the defendant, Nava Shipping Co., Ltd., a Cypriot corporation with offices in Nicosia, Cyprus. At all times pertinent to this action, the vessel was being operated under a time charter which had been entered into between the shipowner and Eastern Mediterranean Maritime Limited. On December 17, 1975, the time charterer entered into a bulk sugar charter with Westway Trading Corporation of New Jersey for the carriage of a cargo of approximately 4,000 long tons of raw sugar from Nicaragua to any one of several designated ports in the United States. The next day, plaintiff Amstar contracted to purchase from Westway 4,000 long tons of sugar to be shipped on the ALEXANDROS T.

Pursuant to the bulk sugar charter, the ALEXANDROS T. took on a cargo of sugar in the port of Corinto, Nicaragua. Loading was completed on January 15, 1976, and bills of lading were then issued. On January 23, 1976, Amstar designated Baltimore as the port of discharge for the sugar it had purchased. When the vessel arrived at Baltimore Anchorage on January 29, 1976, Amstar was the owner of the cargo of sugar.

On January 31, 1976, a Saturday, the ALEXANDROS T. proceeded to the Amstar pier in Baltimore and docked at about 7:00 A.M. that day. Shortly thereafter the vessel's hatches were opened, and Henry Kief, manager of the raw sugar and customs department of Amstar's Baltimore facility, came aboard and observed what he believed to be wetness of some of the sugar. At 8:45 A.M., discharge of the cargo was halted because Mr. Kief had concluded that the sugar was more damaged than he had first supposed. Mr. Kief telephoned his superior in New York, who, among other things, ordered that a marine surveyor be engaged to insure a proper determination of the cause and extent of the apparent damage.

At approximately 9:00 A.M. the same day, Ramsay, Scarlett & Co., agents for the time charterers, contacted the Baltimore law firm of Ober, Grimes & Shriver, which was the Baltimore representative of West of England Shipowners Mutual Insurance Association Limited, the liability insurer of the vessel. The request was made that a representative of the law firm make an immediate investigation aboard the ALEXANDROS T. with regard to a possible claim for cargo damage. At approximately 9:30 A.M., John H. West, III, of the Ober firm engaged marine surveyor Sumner R. Dolber, of Edward F. Carter & Associates, to assist in the investigation. One half-hour later, Messrs. West and Dolber arrived at the ship and commenced their investigations. Mr. West primarily interviewed the ship's master, Captain P. Daskalakis, and Mr. Dolber observed the discharge of the sugar, which had by that time been started up again and was continuing.

At approximately 11:15 A.M., Paul Trapani, a marine surveyor from Baltimore Cargo Surveyors who had been engaged by Amstar, arrived at the ship to begin his survey. He proceeded to the office of the ship's master, where he found Mr. West and Mr. Dolber. Mr. Trapani began his survey by inquiring into the cause and extent of the cargo loss but was then asked to leave the ship by Mr. West and Captain Daskalakis. Mr. Trapani complied and left the ship. However, other representatives of Amstar remained on board, including Mr. Kief, who was supervising the entire discharge operation on behalf of Amstar. Discharge was completed that same day (January 31, 1976), and the ship then left the Amstar pier and proceeded to anchorage in the Baltimore harbor.

On Monday morning, February 2, 1976, Amstar engaged Baltimore counsel and transmitted all the facts within its knowledge to counsel by telephone. Pleadings were prepared, and at 3:31 P.M., counsel filed a complaint *in rem* against the ALEXANDROS T. and *in personam* against Nava Shipping Co., Ltd. with process of foreign attachment, claiming damages of

$600,000 for loss to this cargo of sugar. The vessel was arrested by the United States Marshal at 5:30 P.M. on February 2, 1976 and at the same time was served with process of attachment and garnishment. At approximately 9:30 P.M. on February 2, counsel for defendants received notice that suit had been filed and the vessel arrested.[2] The next day, February 3, the defendants, appearing specially through the firm of Ober, Grimes and Shriver, filed the present motion to dismiss the complaint.

At the time the complaint was filed, the plaintiff had likewise filed various papers seeking immediate discovery, including a motion for an examination of the ship and its cargo and a notice to take depositions on February 3, 1976, commencing at 10:00 A.M. At the same time that they filed their motion to dismiss, the defendants filed a motion to quash the depositions noted and also moved for a protective order. Following discussions between counsel during the evening of February 2, it was agreed that the depositions would not be taken until a hearing could be held on the defendants' motion to quash and for a protective order. A hearing was in fact held on February 5, 1976, before Judge Blair. On that same day, Judge Blair entered an Order denying the defendants' motion and permitting the taking of depositions of the Master and various ship's officers, commencing on Friday, February 6, 1976. The Order further provided that the defendants should produce certain documents and should permit plaintiff's surveyors to board the vessel on February 6 so that necessary surveys could be conducted.

Following the arrest and attachment of the vessel, counsel entered into negotiations for its release. Damages in the amount of $600,000 had been claimed in the complaint, and counsel for the plaintiff requested that a surety bond in that amount be filed or a letter of undertaking from the vessel's insurer undertaking to pay Amstar's claim, whether it was more or less than $600,000. Following various negotiations relating to the release of the vessel, counsel agreed on February 17, 1976 to a letter of undertaking of more or less than $600,000, but in no event more than the value of the vessel when that was determined. Pursuant to that agreement, the ship was released on February 17, 1976 and left the Port on that day.[3]

Following discovery undertaken by counsel for the plaintiff while the ship was still in Baltimore, counsel for the defendants were advised on March 15, 1976 that the estimated claim would not exceed $200,000. This figure was later revised to $175,000, and a letter of undertaking in that latter amount was executed on June 8, 1976 by the liability insurer of the vessel.

## II

### The Due Process Argument

The principal contention advanced by the defendants in support of their motion to dismiss is that the admiralty procedures whereby the ALEXANDROS T. was arrested and attached violate the due process clause of the Fifth Amendment.[4] Defendants rely on recent Supreme Court cases holding that certain state attachment and garnishment procedures violate the due process clause of the Fourteenth Amendment. The cases in question are *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); *Fuentes*

2. Court records indicate that there was a conference with counsel for both the plaintiff and the defendants held during the late afternoon of February 2, 1976. The defendants claim that these records are in error and that their attorneys were not notified of this suit until late that evening. For the purposes of a decision on the pending motion, defendants' version of the facts will be assumed to be correct.

3. According to records of the Baltimore Maritime Exchange, the ship was moved on February 9, 1976 from a pier at the foot of Broadway to the Bethlehem Steel Company yard in Baltimore Harbor for necessary repairs.

4. In their motion, defendants assert that these procedures violate the due process clause of the Fourteenth Amendment. However, since federal and not state procedures are here being attacked, it is clear that the defendants' contention arises under the Fifth Amendment to the United States Constitution, not the Fourteenth.

*v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Mitchell v. W. T. Grant Co.,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *North Georgia Finishing, Inc. v. Di-Chem, Inc.,* 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975).[5]

A similar claim was presented in a case recently decided by Judge Thomsen in this Court, namely *Techem Chemical Co., Ltd. v. M/T Choyo Maru,* 416 F.Supp. 960 (D.Md. 1976). In that case, Judge Thomsen considered, *inter alia,* an attack on the constitutionality of the *in rem* and maritime attachment procedures set out in Rule 9(h), F.R.Civ.P., and in Rules A, B, C and E of the Supplemental Rules. However, Judge Thomsen found it not necessary to decide the constitutional question in that particular case, concluding that under the circumstances presented defendant shipowner was entitled to equitable relief substantially as satisfactory as the relief to which it would have been entitled if the admiralty process under attack were declared to be unconstitutional. 416 F.Supp. at 970. Judge Thomsen did note, however, that the recent Supreme Court cases cited herein "indicate that there is a serious question whether the provisions in the Supplemental Rules for proceedings *in rem* and proceedings *in personam* with process of maritime attachment provide due process to owners of the vessels seized." 416 F.Supp. at 969–970.

The undersigned would agree with the observation made by Judge Thomsen in the *Techem Chemical Co.* case. The defendants in this case argue that because of what occurred here, this "serious question" should be resolved in their favor and that this Court should now declare these admiralty procedures to be unconstitutional. However, after a study of the voluminous briefs and after hearing argument in open court, this Court concludes that this is not the case in which these important and useful admiralty procedures should be declared unconstitutional. The defendants have not established to this Court's satisfaction that under the peculiar facts here present they were denied due process of law. On the contrary, the facts of this case and the procedures available to the defendants in this Court indicate that defendants were afforded the protections required by the *Sniadach* line of cases.

As Judge Thomsen said in *Techem Chemical Co., supra,* at 968:

> Due process is inherently a flexible concept; what process is due in any situation is determined by an analysis of the particular circumstances, including the functions served and interests affected.

This observation is particularly pertinent to a consideration of due process rights under the *Sniadach* line of cases. In *Mitchell v. W. T. Grant Co., supra,* the Supreme Court abandoned the strict pre-seizure hearing rule of *Fuentes* and instead substituted a balancing of interests analysis. *Jonnet v. Dollar Savings Bank,* 530 F.2d 1123, 1126 (3d Cir. 1976). In *Mitchell,* the Court considered the constitutionality of Louisiana sequestration procedures. The Court balanced the policies behind the Louisiana procedures against the concerns of the debtor and found that the latter's property interests were adequately protected from arbitrary or wrongful deprivation by the state sequestration procedures in question. The Court said the following (416 U.S. at page 611, 94 S.Ct. at page 1902):

> The usual rule has been "[w]here only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for ultimate judicial determination of liability is adequate." *Phillips v. Commissioner,* 283 U.S. 589, 596–597 [51 S.Ct. 608, 75 L.Ed. 1289] (1931)

It has long been recognized that admiralty procedures for the attachment or arrest of a foreign vessel are a useful and necessary part of the admiralty law. *See Manro v. Almeida,* 23 U.S. (10 Wheat.) 473, 6 L.Ed. 369 (1825) (as to attachment); Rogers, *Enforcement of Maritime Liens and Mortgages,* 47 Tulane L.Rev. 767 (1973) (as to arrest). The facts of this case emphasize the utility of such procedures, which permit the adjudication of claims against a vessel in a

5. These cases will be referred to herein as "the *Sniadach* line of cases."

federal court located in the American port where the vessel's cargo is unloaded rather than in some distant foreign country. Vessels are highly mobile, and the practicalities of maritime commerce require that a ship unload its cargo in a particular port and be on its way as soon as possible. This vessel was from Cyprus and had it not been promptly seized, the plaintiff might well have been required to go to Nicosia, Cyprus to file suit. Yet all the basic facts pertaining to the condition of the cargo when the vessel docked in Baltimore had been ascertained here in this Port when the cargo was unloaded. Surveyors representing the ship had inspected the sugar. Even though plaintiff's surveyor had been ordered off the ship, representatives of plaintiff had observed the unloading, and plaintiff was in possession of the cargo itself in Baltimore following unloading. Certainly, under these circumstances, the convenience of parties and witnesses dictated that the claim be adjudicated here in Baltimore. Yet in the absence of these admiralty procedures permitting seizure of the ship in Baltimore where unloading occurred, there would have been nothing to prevent the ship from leaving the Port soon after unloading, thus preventing the plaintiff from trying the claim in the forum that was on balance the most convenient for all concerned. If claimants in the United States could not avail themselves of maritime arrest and seizure procedures, foreign shipowners would be presented with a tactical advantage of some magnitude in resisting valid claims for cargo loss asserted by American plaintiffs.

These important policy considerations, which apply nationwide, must be balanced against a shipowner's Fifth Amendment right to be protected against the arbitrary or wrongful deprivation of his property. As the *Sniadach* line of cases indicates, the garnishment, attachment or other procedure being attacked must be examined in the light of the particular circumstances that apply to the procedure in question. In general, due process requires that an individual be given notice and an opportunity to be heard before being deprived of a property interest. *Sniadach v. Family Finance Corporation, supra.* Quite obviously, the defendants cannot complain of lack of notice in this case. Even before suit was filed, attorneys for the ship were advised of the apparent water damage to the cargo of sugar which had been carried by the ALEXANDROS T. Defendants' attorney and a surveyor investigated the possible claim even before it was formally asserted. And when a surveyor hired by the plaintiff attempted to conduct his investigation on board the ALEXANDROS T., he was ordered off the ship. Thus, by the time this suit was filed, the defendants were in possession of the basic facts surrounding the claim and had even sought a tactical advantage by refusing to allow plaintiff's representative to investigate on board the vessel. Defendants' attorney had interviewed the master of the ship, and a marine surveyor employed by them had observed the discharge of the cargo and had assessed the amount of the damage. This, then, is not a case in which a ship is seized and held because of an unknown and unfounded claim. Not only did the defendants have knowledge of the claim, but they were in possession of many more facts pertaining to the claim's validity than the plaintiff, even *before* suit was filed.

Insofar as the due process hearing requirement is concerned in a case of this sort, it would clearly not be practical to require a federal court hearing before permitting seizure of a foreign ship. Indeed, defendants concede that because ships are mobile, it would be asking too much to require that these admiralty rules provide for an *adversary* hearing *before* the arrest or attachment. However, defendants do assert that the admiralty procedures in question are deficient in not permitting an immediate post-seizure hearing concerning the propriety of the attachment and arrest.

Whatever procedures may apply in other courts, this Court does indeed provide a mechanism permitting an immediate conference or hearing before a judge if sub-

stantial rights are claimed to have been infringed by a litigant. Each week a particular judge of this Court is designated the "Chambers Judge". This system is well known to practitioners in this Court. The Chambers Judge is available at all hours of the day and night and on weekends for conferences or hearings on motions for Temporary Restraining Orders or on other matters that require the Court's immediate attention. The official Court Calendar designates the particular Chambers Judge who is assigned this responsibility each week, and judges of this Court have regularly conducted hearings or conferences after Court hours and on weekends.

Had there been a serious question raised in this case that this shipowner defendant was being wrongfully or arbitrarily deprived of its property right in its ship by the seizure in this case, such matter could have been promptly brought to the attention of a judge of this Court for consideration. No such question was raised by the defendants because none existed. Rather than being concerned with the deprivation of defendants' property rights, counsel for the defendants were much more immediately concerned with the depositions and other discovery which plaintiffs sought to undertake at once before the ship was released and left the port. Thus, the question of plaintiff's right to immediate discovery was the sole issue pressed during the several days after suit was filed on February 2. In fact, on February 5 a hearing was held before Judge Blair, who was then the Chambers Judge and who allowed discovery to proceed at once.[6] Counsel for the defendants were initially content to file the motion to dismiss but not to press immediately their claim that their property rights had been violated. Although there is a dispute as to whether counsel met with the undersigned Judge on the afternoon of February 2, it is agreed that a conference was in fact held at noon on February 4. At that time, there was no contention by the defendants that the Court should consider at

once their demand for a release of the vessel because their constitutional rights had been violated by the application to them of these admiralty procedures. As the Supreme Court noted in the Di-Chem case, the presently prevailing rule of procedural due process in cases involving attachments indicates that official seizures can be constitutionally accomplished if, along with the other requirements, merely an "opportunity" for a hearing or other safeguard against mistaken taking is afforded. 419 U.S. at 606, 95 S.Ct. 719. Such an opportunity was provided by the practice followed in this Court of having a Chambers Judge available for an immediate ruling where an important right is asserted.

It is true, as the defendants point out, that the admiralty procedures challenged here permit the arrest and seizure of a vessel without requiring that a judicial officer review the pleadings before the writ is issued. However, this one factor does not compel a finding on this record that the defendants' due process rights have been infringed. As the Sniadach line of cases indicates, the determination must be made on the basis of all of the attendant circumstances. Here, the defendants did receive actual notice of the claim and were entitled to an immediate post-seizure consideration by a judicial officer of the validity of the action taken. In view of the other circumstances present in this case, the fact that a judicial officer did not review the pleadings before the vessel was seized does not compel a finding of a constitutional violation here.

■ Defendants further argue that these admiralty procedures permit the seizure of property as a result of merely filing a complaint containing vague and conclusory allegations. Examination of the Rules themselves indicates that there is no merit to this contention. Both Supplemental Rule B(1) and Supplemental Rule C(2) require that an action of this sort be instituted by means of a verified complaint. Rule B fur-

---

6. The undersigned Judge, to whom this case was assigned, was out of town on the afternoon of February 4 and on February 5, when the discovery issue came to a head. The matter was thus referred to Judge Blair as the Chambers Judge for that week.

ther requires that the complaint be accompanied by an affidavit to the effect that the defendant cannot be found within the district. Rule E(2)(a) further requires that the complaint state "the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading."

As discussed more fully in Section III of this Memorandum and Order, the verified complaint in this case fully complied with the Supplemental Rules. The claim for cargo damage here was a simple one, the complaint was verified, and defendants were provided with adequate notice of the nature of the claim by the allegations of the complaint. A *prima facie* case for arresting the ship was thus made out. Had this Court been asked to review the sufficiency of the complaint and the process at any time after defendants' counsel were notified of the suit and had the facts been fully explained as they now have been, the procedures would have been upheld and the seizure permitted. It is disingenuous for defendants to suggest that they were denied an immediate post-seizure consideration of this claimed constitutional deprivation when they never sought one.[7]

Defendants further complain that the Supplemental Rules do not require that a plaintiff post a bond or otherwise protect a defendant against an unwarranted or unconstitutional seizure. But *Techem Chemical Co.* recognized the right of a defendant following the arrest and seizure of its ship to counterclaim for damages resulting from a grossly improper and excessive demand for security made by the plaintiffs. The Court there held that under circumstances such as these, a defendant has the right to apply to an admiralty court sitting as a

court of equity and demand that a plaintiff post security to protect the defendant against loss or injury resulting from the arrest and seizure. Indeed, in the *Techem Chemical Co.* case, Judge Thomsen ordered that unless the plaintiff posted security in the amount of $400,000, the security posted by the defendant shipowner would be released. 416 F.Supp. at 972. This was the alternative relief requested by the defendant in that case.

Defendants in this case have at no time formally sought to require the plaintiff to post security protecting them from loss because of the arrest and seizure of the ALEXANDROS T. Had such security been a matter of immediate concern to the defendants, the question could have been presented to a Chambers Judge of this Court soon after suit was filed.

In any event, the circumstances here indicate that this is not a case like *Techem Chemical Co.* in which the amount claimed in the complaint was completely unjustified because of facts available to those undertaking to speak for the plaintiffs. There, the original claim was later shown to have been more than ten times the actual loss. In this case, discovery indicates that the original claim was about three and one-half times the amount of the letter of undertaking. Moreover, in this case, defendants have only themselves to blame for the size of the original claim. The necessary facts for appraising the size of the claim became unavailable to plaintiff because of defendants' acts. A surveyor representing plaintiff came on board the ship on January 31, 1976 in an attempt to ascertain the amount of the damage while the cargo was being discharged and before suit was filed. He was ordered off the ship by representatives of the defendants and thus could not appraise the amount of the loss and the condition of the ship at the most appropriate

---

7. In summing up their argument at p. 29 of their Brief, defendants assert: "If *Fuentes* and *Di-Chem* mean anything they mean at least that at a pre-seizure hearing or an immediate postseizure hearing, to which the property owner has a right and at which the seizing plaintiff has the burden of proof, a judicial

officer will pass on the question whether the seizing plaintiff has established a *prima facie* case with respect to whether probable cause underlies the seizure." Just such an immediate post-seizure hearing was available to defendants had they asked for it.

time of all, namely during unloading operations and before any corrective steps could be taken by defendants.[8] Unlike the situation in *Techem Chemical Co.*, the equities here favor the plaintiff, which sought in good faith to determine the amount of the loss before the arrest and seizure. In seeking an early tactical advantage, defendants in this case disentitled themselves to equitable relief of the sort granted to the defendants in *Techem Chemical Co.* because of an excessive demand for security made by the plaintiff.

In *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974), the Supreme Court upheld as constitutional the seizure, without prior notice or a prior adversary hearing, by the Commonwealth of Puerto Rico of a yacht used to transport marijuana. In weighing the policy considerations behind the Puerto Rican statutes, the Court made the following observation, *inter alia* (at 679, 94 S.Ct. at 2090):

> " * * * pre-seizure notice and hearing might frustrate the interests served by the statutes, since the property seized—as here, a yacht, will often be of a sort that could be removed to another jurisdiction, * * * if advance warning * * * were given."

In *Central Soya Co. v. Cox Towing Corp.*, 417 F.Supp. 658 (N.D.Miss.1976), the Court rejected a constitutional attack on the Supplementary Rules similar to the one made here, finding that the shipowner had in fact been afforded both notice and hearing prior to the seizure of the vessel. Concededly, the facts of that case were quite different from those here, but the case is illustrative of the principle that due process challenges of this sort can be considered only in relation to the particular facts pertaining to each different arrest and seizure.

Defendants' reliance on *North Georgia Finishing, Inc. v. Di-Chem, Inc., supra*, is

misplaced. The facts here are quite different from those in *Di-Chem*, in which the Supreme Court held a Georgia garnishment statute unconstitutional. In *Di-Chem*, the Court noted, *inter alia*, that the property owner had been afforded no notice or opportunity for an early hearing. Here, the shipowner defendant knew of the existence of the claim before suit was filed and promptly after the action was brought could have presented its contention of an unconstitutional seizure to a Chambers Judge of this Court. Moreover, the policy considerations supporting these admiralty procedures are much stronger than were those behind the Georgia garnishment statute in *Di-Chem*. When balanced against the concerns of foreign shipowners who transact business in ports of the United States, the interests furthered by these nationwide admiralty procedures are entitled to considerably more weight than those behind Georgia's garnishment law. Accordingly, a more flagrant showing than has been presented here of an arbitrary deprivation of property would be necessary before this Court would declare these procedures unconstitutional under the *Sniadach* line of cases.

For these reasons, there is no merit to the first argument asserted by defendants in support of their motion to dismiss the complaint.

### III

#### Other Arguments

■ The other grounds for dismissal raised by defendants have not been forcefully urged and can be disposed of quite readily. Defendants first assert that this Court lacks jurisdiction over the subject matter and person of Nava Shipping Co., Ltd. for the reason that verification of the complaint by plaintiff's attorney, rather than by plaintiff itself, did not satisfy the

---

8. One of the plaintiff's contentions is that seawater entered the cargo holds through the deteriorated hatches of the vessel. Plaintiff asserts that on February 5, 1976, before plaintiff's survey, structural repairs were undertaken in the vicinity of the hatches and that therefore it has been prevented from determining the condition of the hatches during the voyage. These matters are disputed by defendants and can be resolved only after an evidentiary hearing.

requirement of Rule C of the Supplemental Rules.

The verification attached to plaintiff's complaint states that it is made by Mr. Krach because plaintiff is a corporation "which does not have offices within the district." Relying upon the Baltimore telephone directory and a letter written under an Amstar letterhead, defendants assert that plaintiff does indeed have offices within this district. Plaintiff does not deny this fact. However, plaintiff asserts that the word "offices" in Mr. Krach's verification was merely a typographical error which was cured by the filing on February 24, 1976 of a supplemental verification, which includes the word originally intended, "officers".

Rule C(2) of the Supplemental Rules provides: "In actions *in rem* the complaint shall be verified on oath or solemn affirmation." The Rule does not state by whom the complaint must be verified, unlike Rule B(1), which provides that the affidavit required by that Rule may be executed by either the plaintiff or his attorney. In 7A Moore's *Federal Practice* ¶ C.08 it is stated: "Most local admiralty rules provided that if the plaintiff is beyond the jurisdiction of the Court, or otherwise unavailable, his attorney may verify the Complaint." The Local Rules for the District of Maryland do not specifically authorize this practice.

Plaintiff asserts that even though it has a refinery and an office of some kind within this district, there were no officers of plaintiff in this district with authority to execute the verification required by the Rule. Defendants argue that the Rule requires that as long as a plaintiff has any office or plant in the district, an employee of the plaintiff must execute the verification. Absent compelling authority, this Court would reject such a formalistic construction of Rule C. The purpose of the Rule is served more readily if it is interpreted to require verification by an officer or attorney authorized to make the statements, rather than by a mere employee. This Court concludes that the procedure utilized

by the plaintiff here was sufficient compliance with Rule C.

■ Defendants next contend that this Court lacks jurisdiction over the person of Nava Shipping Co., Ltd. because the complaint was not accompanied by an affidavit signed by plaintiff or its attorney that the defendant could not be found in this district, as required by Rule B. Defendants have cited no authority which would suggest that the failure of a plaintiff to submit a separate affidavit to this effect would require dismissal of a complaint under the circumstances present here. The complaint itself is verified, and paragraph 3 recites that defendant "is a corporation organized and existing under and by virtue of a foreign state with an office and place of business at Nicosia, Cyprus . . . ."

Previous to the promulgation of Rule B in 1966, it was the duty of the United States Marshal who served process to ascertain that the proposed defendant could not be found within the district. The purpose of the affidavit requirement is to shift that burden to the plaintiff. *See* Advisory Committee Notes to Rule B. Several cases involving the question whether there was compliance with the affidavit requirement of Rule B are discussed in 7A Moore's *Federal Practice* ¶ B.07. Some of these cases apparently involved contentions by defendants that if the plaintiffs had exercised the requisite diligence, they would have found the defendants in the forum districts. In other cases, the defendants claimed that their property was being attached merely as harassment. In this case, the defendants are not contending that Nava Shipping Co., Ltd. could in fact have been found within this district or that the ALEXANDROS T. was attached merely to harass the defendant. On the contrary, the stipulated facts indicate that plaintiff did indeed have a colorable claim for cargo loss or damage, that the shipowner was from Cyprus and that maritime attachment procedures were necessary if the claim was to be litigated in the United States. In these circumstances, the Court would deem the plaintiff's state-

338

ment in the verified complaint to constitute sufficient compliance with Rule B.

■ As their next contention, defendants assert that Rule 19, F.R.Civ.P., requires the joinder in this action of Eastern Mediterranean Maritime, Ltd., the time charterer of the vessel, and of Thenamais Ltd., agents for the time charterer, on whose behalf the bills of lading covering carriage of the sugar were issued. Defendants cite no authority in support of this argument, nor are any reasons advanced why these additional parties should be joined. Defendants have not indicated whether it would be feasible to join these additional parties pursuant to Rule 19(a) or whether factors exist requiring dismissal of this action in the absence of these parties pursuant to Rule 19(b). Defendants' contention under Rule 19 will accordingly be rejected.

■ Although the point was not specifically listed as a ground for dismissal in defendants' motion, defendants argue in their brief that the complaint fails to state a claim upon which relief can be granted. Defendants contend that the complaint fails to allege the violation of a bill of lading contract, or that the cargo was carried pursuant to a charter party, or that the action is for negligence. Defendants cite no authority in support of their contention that the failure of the plaintiff to allege one of these three specific causes of action in the complaint requires the dismissal of this suit for failure to state a claim.

Rule 8(a)(2) requires no more than a short and plain statement of the claim showing that the pleader is entitled to relief. A review of the complaint in this case indicates that it complies with this requirement. The claim here is a simple one, namely that raw sugar belonging to plaintiff was loaded on the ship in good condition at Corinto, Nicaragua and that on discharge in Baltimore some time later, the sugar was in a damaged condition. Allegations to this effect clearly put the defendants on notice concerning the nature of the claim being asserted against them. Modern rules for pleading in the federal courts do not require that any particular form be used so long as

a defendant is adequately apprised of the nature of the claim being asserted. Details concerning the bill of lading or the charter party can be ascertained by appropriate discovery procedures.

■ Finally, defendants additionally argue that service of process upon Ramsay, Scarlett & Co., local agent of the time charterer, was insufficient to constitute service upon the defendant shipowner. Rule B provides that no default judgment shall be entered in an *in personam* action unless certain notice requirements have been satisfied. Since plaintiff is not seeking a default judgment, the notice requirement of Rule B is not implicated here. Rule C requires that certain notice be given only if the arrested property has not been released in accordance with Rule E(5). However, the ALEXANDROS T. has been released pursuant to Rule E(5), making the notice requirement of Rule C inapplicable.

The Supplemental Rules presume that if property is placed under arrest or attachment and garnishment, the custodian of the property will notify the owner of the pending action. Since the plaintiff by hypothesis has located the property and may have found its custodian but may not know the identity of the owner, the plaintiff is relieved initially of the burden of serving the owner personally. However, the owner is provided protection from forfeiture without notice by the requirements described above.

In this case, defendants clearly had actual notice of the claim asserted against them and cannot now be heard to complain that service of process was so defective as to deprive this Court of jurisdiction. *See Walter E. Heller & Co. v. Kocher*, 262 Md. 471, 278 A.2d 301 (1971).

For the reasons stated, it is this 2nd day of May, 1977, by the United States District Court for the District of Maryland,

ORDERED:

1. That defendants' motion to dismiss the complaint be and the same is hereby denied; and

2. That defendants shall file an answer within fifteen days.